# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | | |
|---|---|---|
| **MARIAN CARR** | * | **CIVIL ACTION NO. 08-0326** |
| **VERSUS** | * | **JUDGE JAMES** |
| **SPHERION, ET AL.** | * | **MAGISTRATE JUDGE HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion for summary judgment [doc. # 91] filed by defendants, Plymouth Tube Company and Travelers Property Casualty Company of America. For reasons assigned below, it is recommended that defendants' motion for summary judgment [doc. # 91] be GRANTED.

## Background

On February 14, 2008, Marian Carr filed the above-captioned suit against defendants, Spherion, Plymouth Tube Company ("Plymouth"), and Travelers Property Casualty Company of America (incorrectly named in the petition as "Travelers Insurance," hereinafter referred to as "Travelers"),[1] in the 4th Judicial District Court for the Parish of Ouachita, State of Louisiana. Carr alleged that on May 16, 2007, she severely injured her left hand on a rotary straightener machine while working within the course and scope of her employment at Plymouth. (Petition, ¶¶ IV-V).[2] Plaintiff alleged not only that the accident and resulting injuries were caused by

---

[1] Travelers is Plymouth's liability carrier. (Petition, ¶ III).

[2] She simultaneously worked for Spherion, a "temp" service, which had sent her to the job site at Plymouth. *Id*. at ¶ I.

defendants' "negligence," but that the accident was substantially certain to occur and that it rose to the level of an "intentional act." (Petition, ¶ V).

On March 6, 2008, defendants Plymouth and Travelers removed the case to federal court on the basis of diversity jurisdiction. 28 U.S.C. §1332. (Notice of Removal).[3] On November 7, 2008, defendants, Plymouth and Travelers (collectively "Plymouth"), filed the instant motion for summary judgment seeking dismissal of plaintiff's claims against said defendants. Following delays for additional discovery and briefing, the matter is now before the court.

## Summary Judgment Standard

Summary judgment is appropriate when the evidence before the Court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed R. Civ. P. 56(b). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2511 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

_____

[3] Carr dismissed Spherion without prejudice prior to removal. *See*, February 22, 2008, Motion and Order. After removal, Carr amended her complaint to assert products liability claims against several alleged manufacturers of the subject machine. *See*, 1st Suppl. & Amend. Compl. [doc. # 25]; 3rd Suppl. & Amend. Compl. [doc. # 63]. In the process, she joined (or re-joined) various Spherion entities before (again) dismissing them. (*See*, August 15, 2008, Order [doc. # 76]; December 2, 2008, Judgment [doc. # 108]).

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id*.

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). There can be no genuine issue as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

When a movant bears the burden of proof on an issue, it must establish "beyond peradventure[4] all of the essential elements of the claim . . . to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). In other words, the movant must affirmatively establish its right to prevail as a matter of law. *Universal Sav. Ass'n v. McConnell*,

_____

[4] I.e., beyond doubt.

1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

**Analysis**

Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S.Ct. 2211(1996); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817 (1938). Both sides address plaintiff's claims under Louisiana law, and thus implicitly agree that the disputed issues are governed by the substantive law of Louisiana. *See, In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007) (deferring to the parties' agreement that Louisiana substantive law controlled), *cert. denied sub nom. Xavier University of Louisiana v. Travelers Cas. Property Co. of America*, ___ U.S. ___, 128 S.Ct. 1230 (Feb 19, 2008); *Jefferson v. Lead Indus. Ass'n*, 106 F.3d 1245, 1250 (5th Cir. La. 1997) (applied Louisiana law where no party disputed that Louisiana law governed).[5] To determine Louisiana law, federal courts look to the final decisions of the Louisiana Supreme Court. *Moore v. State Farm Fire & Casualty Co.*, ___ F.3d ___, (5th Cir. Jan. 21, 2009) (citation omitted).

## I. Tort Immunity under the LWCA

### a) Statutory Employer

Plymouth contends that at the time of the accident it was Carr's statutory and/or special employer. (Def. Mem., pgs. 1, 4). The Louisiana Workers' Compensation Act ("LWCA") provides that *except for intentional acts*, workers' compensation benefits are an employee's exclusive remedy for work-related injuries and illnesses against her employer. La. R.S. 23:1031-

---

[5] In *Jefferson*, the Fifth Circuit's decision incorporated the underlying district court opinion, 930 F. Supp. 241 (E.D. La. May 31, 1996) (J. Vance)

4

1032; *Deshotel v. Guichard Operating Co.*, 916 So. 2d 72, 75 (La. 2004) (citation omitted);

*Harris v. Wal-Mart Stores, Inc.*, 205 F.3d 847, 849 (5th Cir. 2000); *McGinnis v. Waste*

*Management of Louisiana, L.L.C.*, 914 So.2d 612, 615 (La. App. 2d Cir. 2005). The tort

immunity conferred by the LWCA applies not only to an employee's direct employer, but also to

any statutory and/or borrowing/special employer. La. R.S. 23:1031-1032, 1061; *Hirst v.*

*Thieneman*, 905 So.2d 343, 352 (La. App. 4th Cir. 2005) (statutory employer); *Andrew-Hong v.*

*Gray Ins. Co.*, 945 So.2d 124, 127 (La. App. 4th Cir. 2006) (borrowing/special employer).

Nevertheless, under the LWCA, the statutory and special employer doctrines remain distinct.

*Arabie Bros. Trucking Co., v. Gautreaux*, 880 So.2d 932, 939 (La. App. 1st Cir. 2004); *Griffin v.*

*Wickes Lumber Co.*, 840 So.2d 591, 595-596 (La. App. 1st Cir. 2002). One critical difference is

that statutory employer status requires a written contract between the principal and contractor,

whereas special/borrowing employer status does not. *Boucher v. Graphic Packaging Intern.,*

*Inc.*, 281 Fed. Appx. 306, 308-309 (5th Cir. Jun 5, 2008) (addressing statutory employer)

(unpubl.) (citing La. R.S. 23:1061(A)(1)); *Griffin, supra* (addressing borrowing employer);

*Arabie, supra* (borrowing employer).[6]

   Here, the parties agree that there was no written contract between plaintiff's nominal

employer, Spherion, and defendant, Plymouth. (*See e.g.*, Clyde Self Depo., pg. 11; Pl. Exh. 6).[7]

---

   [6] A defendant may establish that it was plaintiff's special or borrowing employer
notwithstanding its inability to meet the contractual requirements for statutory employer status.
*McGinnis*, 914 So.2d at 615-616. The statutory employer legislation contains a written contract
requirement that is not replicated in the special/borrowing employer provision. *Compare*, La.
R.S. 23:1061 and La. R.S. 23:1031.

   [7] Clyde Self is Plymouth's Manager of Manufacturing Excellence. *Id.* at pg. 6. He was
Plymouth's Human Resources Manager at the time of plaintiff's accident. *Id.*

Accordingly, Plymouth was not Carr's statutory employer.  *Boucher, supra.*

b)  Special or Borrowing Employer

In 1997, the Louisiana legislature codified the borrowed employee or "special" employer doctrine.  *Stephens v. Witco Corp.*, 198 F.3d 539, 542-543 n2  (5th Cir. 1999).  The statute provides in relevant part that

> [i]n the case of any employee for whose injury or death payments are due and who is, at the time of the injury, **employed by a borrowing employer** in this Section referred to as a **"special employer", and is under the control and direction of the special employer in the performance of the work**, both the special employer and the immediate employer, referred to in this Section as a "general employer", shall be liable jointly and in solido to pay benefits as provided under this Chapter. As between the special and general employers, each shall have the right to seek contribution from the other for any payments made on behalf of the employee unless there is a contract between them expressing a different method of sharing the liability. Where compensation is claimed from, or proceedings are taken against, the special employer, then, in the application of this Chapter, reference to the special employer shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the general employer by whom he is immediately employed. **The special and the general employers shall be entitled to the exclusive remedy protections provided in R.S. 23:1032.**

La. R.S. 23:1031(C) (emphasis added).[8]

---

[8]  Stated another way,

> [a]n individual may be the "general" employee of one employer and a "special" employee of another. The general employer is also referred to as the "lending" employer and the special employer is called the "borrowing" employer. The simplest example of this relationship is the labor pool (general employer) that hires out the labor pool employees to a special employer who will assume the control of the labor pool personnel in the performance of a particular task.

*McGinnis, supra* (quoting Denis Paul Juge, *Louisiana Workers' Compensation*, § 7.4 (2d ed.2002) (citations omitted)).

The foregoing example mirrors the scenario presented here:  Spherion placed temporary employees on assignment at Plymouth where their work was directed and supervised by Plymouth personnel.  (Nancy Griggs Deposition, pg. 10, Pl. Exh. 7; Marian Carr Deposition, pg. 106; Pl. Exh. 1).  Griggs is the owner of Spherion Staffing's West Monroe branch.  (Griggs Depo., pg. 4, Pl. Exh. 7).

Prior to the 1997 legislation, the courts regularly applied a nine (sometimes ten) factor test to determine borrowing employer status. *See e.g., Stephens, supra*. Since the 1997 enactment, Louisiana appellate courts, as well as federal courts applying Louisiana substantive law, have perpetuated the nine factor test; thus, we do the same here, subject to tweaking as compelled by the circumstances of this case. *See e.g., Arabie, supra*; *McGinnis, supra*; *U.S. Fire Ins. Co. v. Miller*, 381 F.3d 385, 388 (5th Cir. 2004).[9]

The nine factors that courts traditionally consider to determine special or borrowing employer status include,

1.    Who had control over the employee and the work he was performing beyond mere suggestion of details or cooperation?

2.    Whose work was being performed?

3.    Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

4.    Did the employee acquiesce in the new work situation?

5.    Did the original employer terminate his relationship with the employee?

6.    Who furnished tools and place for performance?

7.    Was the new employment over a considerable length of time?

8.    Who had the right to discharge the employee?

9.    Who had the obligation to pay the employee?

*Sanchez v. Harbor Const. Co., Inc.*, 968 So.2d 783, 786 (La. App. 4th Cir. 2007) (citations

_____

[9] Federal district courts sitting in Louisiana, Mississippi, and Texas are bound to follow the interpretations of Louisiana law as expressed by the United States Fifth Circuit Court of Appeals absent some intervening change in state law by the Louisiana State Legislature or the Louisiana Supreme Court. *See, In Re Exxon Coker Fire*, 108 F. Supp.2d 628, 629 (M.D. La. 2000) (citing *F.D.I.C. v. Abraham*, 137 F.3d 264, 268 (5th Cir. 1998)).

omitted).

No single factor is determinative. *Omega Const. v. Thornco, Inc.*, 994 So.2d 65, 67-68 (La. App. 1st Cir. 2008). Whether a borrowed employee/borrowing employer relationship exists is an issue of law for the court decide. *Capps v. N.L. Baroid-NL Industries, Inc.*, 784 F.2d 615, 617 (5th Cir. 1986);[10] *Omega Const., supra*. However, the party asserting special employer status bears the burden of proof. *Perry v. Perry & Sons Vault & Grave Service*, 872 So.2d 611, 616 (La. App. 3d Cir. 2004) (citation omitted); *see also, Walls v. American Optical Corp.*, 740 So.2d 1262, 1267-1268 (La. 1999) (burden on defendant to prove statutory employer immunity). Nonetheless, if sufficient basic factual ingredients remain undisputed, the court may resolve the issue on summary judgment. *Capps, supra* (citation omitted). To defeat summary judgment, the non-movant must show that "genuine disputes exist over enough determinative factual ingredients to make a difference in [the] result." *Id.*

Before considering the relevant factors, it is important to recall that the borrowed employee doctrine originated as a means of imposing respondeat superior liability upon a borrowing employer. *See, Gaudet v. Exxon Corp.*, 562 F.2d 351, 356 (5th Cir. 1977); *Benoit v. Hunt Tool Co.*, 219 La. 380, 53 So.2d 137 (1951). Under the law then in effect, if the court determined that the worker was a borrowed employee of the special employer, then the lending or general employer was relieved of responsibility for the wrongs committed by the worker. *Morgan v. ABC Manufacturer*, 710 So.2d 1077, 1081 (La. 1998). In other words, *either* the special employer was liable for the worker's actions *or* the general employer was liable, but not

---

[10] *Capps* addressed borrowed employee status under Louisiana and federal law. *Id.* The criteria are the same under both regimes. *Id.*

both. *Id*.

In 1969 when the Fifth Circuit originally gathered the factors to be considered in the borrowed employee analysis, it necessarily relied upon case law that employed a "one employer" approach to respondeat superior liability. *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312 (5th Cir. 1969) (citing *Standard Oil Co. v. Anderson*, 212 U.S. 215, 222, 29 S.Ct. 252, 254 (1909)). As a result, considerations such as the right of control and whether the general employer had terminated its relationship with the employee remained paramount. *See, Ruiz, supra*.

However, under the LWCA as now written, the general/lending and special/borrowing employers are *both* responsible for workers' compensation benefits, and *both* are entitled to the tort immunity afforded by the LWCA. La. R.S. 23:1031(c). Under the LWCA, it is not necessary to choose one employer over another. Therefore, when considering certain factors of the borrowed employee test, such as the right to control the employee's work or whose work was being performed, the evidence need not point exclusively to the borrowing employer. Instead, special employer status is supported so long as the evidence confirms that the borrowing employer supervised and controlled the employee's actual work performance. *See generally, McGinnis, supra*.[11] Moreover, when the general employer is in the business of providing temporary laborers – i.e., a "vocational lender,"[12] there is inevitably some degree of ongoing or

---

[11] Also, the Fifth Circuit has de-emphasized the control factor when the "borrowed employee" doctrine is employed to establish an employer's immunity from tort. *Melancon v. Amoco Production, Co.*, 834 F.2d 1238, 1245 n12 (citing *Gaudet v. Exxon*, 562 F.2d at 356-57). In this context, the principal focus of the test rests upon the fourth, fifth, sixth, and seventh factors. *Id*.

[12] *See, Maddox v. Superior Steel*, 814 So.2d 569, 574 (La. App. 1st Cir. 2001) (defining "vocational lender") (citing Wex S. Malone & H. Alston Johnson, III, Workers' Compensation Law and Practice § 58, in 13 Louisiana Civil Law Treatise (3d Ed. 1994)).

residual relationship between the vocational lender and the leased worker.  *Morgan, supra.*

Evidence of same, however, should not militate against a finding of special employer status in

light of § 23:1031(c) and the Louisiana Supreme Court's emphasis that an employee can have

two employers.  La. R.S. 23:1031(c); *see, Morgan, supra;*[13] *see also, Boston Old Colony Ins. Co.*

*v. Tiner Associates Inc.*, 288 F.3d 222, 229 (5th Cir. 2002) (dual employer doctrine has modified

the borrowed employee doctrine); *Stephens,* 198 F.3d at 542-543 n2 (implied that enactment of

La. R.S. 23:1031(c) may have affected applicability of ten factor test).

    With this backdrop, the court turns to the facts at hand.

### 1) Who Had Control Over the Employee's Work?

    At her deposition, Carr admitted that while working at Plymouth, her work was always

directed by Plymouth personnel.  (Carr Depo., pgs. 106, 43; Pl. Exh. 1, Def. Exh. 2).  A

Plymouth supervisor provided Carr with instructions for her particular shift.  (Carr Depo., pg. 43;

Def. Exh. 2).  At the beginning of each shift, Carr attended safety meetings conducted by

Plymouth employees.  (Carr Depo., pgs. 44-45; Def. Exh. 2).  In addition, once a temporary

---

[13] In *Morgan v. ABC Manufacturer*, the Louisiana Supreme Court recognized that application of the right of control test proves troublesome when the general employer is a vocational lender.  *Morgan, supra*.  The court reasoned that although vocational lenders pass control of work details to their clients, they retain ultimate and overriding authority over their loaned workers.  *Id*. at 1082-1083.  Moreover, the leased workers are simultaneously advancing the business interests of the vocational lender and the special employer.  *Id*.  In sum, both employers exercise contemporaneous control over the worker.  *Id*.  The court concluded that vocational lenders remain liable for the torts committed by their leased workers even if the multi-factored borrowed employee test otherwise supports a finding that the worker is a borrowed employee of the client company.  *See, Morgan*, 710 So.2d at 1084.  Interestingly, despite the control and responsibility retained by the vocational lender, the court did not appear inclined to disturb the tort immunity accorded to the borrowing employer via the LWCA.  *Morgan*, 710 So.2d at 1083, n10.

worker punched in at Plymouth, Spherion did not exercise any control over the employee while at Plymouth.  (Self Depo., pg. 28; Pl. Exh. 6).

Carr acknowledged that during the entire seven to eight month period that she worked at Plymouth, she only went to the Spherion office once, and that was to discuss her pay.  (Carr Depo., pgs. 94-95; Def. Exh. 2).  She only occasionally contacted Spherion by telephone including once to complain about how Plymouth excluded temporary workers from certain company recreational activities.  (Carr Depo., pgs. 103-104, Pl. Exh. 1).  However, Spherion told her that it had no control over how Plymouth ran its plant.  *Id*.

In opposition to Plymouth's motion, plaintiff submitted her Spherion application wherein she agreed to comply with various Spherion policies which suggest that Spherion retained control over certain aspects of her employment.  (*See*, Spherion Policies and Procedures-Application Suppl., Attach. to Carr Depo., Pl. Exh. 1).  For example, Carr agreed that Spherion remained her employer while on assignment, and that she was to never discuss problems or concerns with the client, but instead, take them up directly with Spherion.  *Id*.[14]  Carr was to also immediately notify Spherion if there were any changes in her required uniform or equipment, or of any changes to her job duties.  *Id*.[15]  Carr further agreed to make weekly contact with Spherion, and to

_____

[14]  During her deposition, however, Carr testified that when her job duty changed at Plymouth, she discussed her pay raise (or lack thereof) with her Plymouth supervisor, Matt Townsend.  (Carr  Depo., pgs. 105-106; Pl. Exh. 1).  Carr added that she could not call Spherion to discuss the matter because they would not have believed her.  *Id*.  Instead, she relied upon her Plymouth supervisor to inform Spherion.  *Id*.

[15]  Carr did not do this in practice, however.  *See e.g.*, fn. 14.

submit weekly time slips to Spherion. *Id.*[16]

Plaintiff also submitted an affidavit that reiterated, and in some instances added to, the Spherion policies contained in her application form. (Carr Affidavit, Pl. Exh. 8).[17] Nevertheless, plaintiff's evidence that Spherion endeavored to retain some degree of control over Carr's employment is consistent with Spherion's status as a vocational lender, and does not undercut the direct control exerted by Plymouth over Carr's day-to-day work activities which otherwise supports Plymouth's special employer status under the LWCA. *See*, discussion, *supra*; *see also, Magnon v. Forest Oil Corp.*, 2007 WL 2736612 (W.D. La. 2007) (worker's evidence of mere and occasional contact with lending employer does not rebut borrowing employer's evidence of control over employee's daily work) (citations omitted). If anything, plaintiff's evidence only serves to support a finding that both Spherion and Plymouth are entitled to the tort immunity conferred by the LWCA. *McGinnis, supra*; *see also*, La. La. R.S. 23:1031(C) ("The special **and** the general employers shall be entitled to the exclusive remedy protections provided in R.S. 23:1032") (emphasis added).

### 2) Whose Work Was Being Performed?

During her deposition, Carr admitted that she was performing Plymouth's work at the

---

[16] However, Carr had only occasional contact with Spherion. (*See*, Carr Depo., pgs. 127-128; Pl. Exh. 1). Carr further acknowledged that Plymouth reported her time cards to Spherion. *Id*. at pgs. 34-35.

[17] For instance, plaintiff averred that she and Spherion understood and agreed that she was employed by Spherion – not Plymouth. *Id*. Such agreements, however, do not negate the borrowing employer's "special employer" status. *McGinnis*, 914 So.2d at 616-17.
To the extent that plaintiff's affidavit conflicts with her deposition testimony, a party cannot defeat a motion for summary judgment by relying upon an affidavit that impeaches, without explanation, prior sworn testimony. *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (citation omitted)

time of the accident. (Carr Depo., pg. 105, Pl. Exh. 1; *accord*, Self Depo., pg. 29, Pl. Exh. 6).

However, because Plymouth was paying Spherion a "markup" for Carr's services, Carr's work at

Plymouth also financially benefitted Spherion. (Self Depo., pgs. 11-12, Pl. Exh. 6; Griggs Depo.,

pg. 10, Pl. Exh. 7). Nonetheless, since Spherion is a vocational lender and because the LWCA

expressly provides for dual employers, the fact that Spherion profited from Carr's work at

Plymouth does not detract from the uncontroverted evidence that plaintiff was performing work

for Plymouth at its facility. *See*, discussion, *supra*. The Fifth Circuit has further held that the

fact that the lending employer's business is to furnish employees to perform the work of other

companies supports a finding that the employee was performing the work of the borrowing

employer. *Capps*, 784 F.2d at 617.

### 3) Was There an Agreement, Understanding, or Meeting of the Minds Between the Original and the Borrowing Employer?

Representatives of Plymouth and Spherion both testified that the two companies had a

verbal agreement for Spherion to provide temporary workers on assignment with Plymouth.

(Self Depo., pgs. 11-12, Pl. Exh. 6; Griggs Depo., pg. 10, Pl. Exh. 7). Plymouth decided the rate

of pay for the temporary workers and paid Spherion a markup percentage. *Id*. Plaintiff argues

that there was no agreement between the parties, because the agreement was not committed to

writing. However, an oral agreement suffices to support special or borrowing employer status.

*See, Griffin, supra; Capps, supra*.

### 4) Did the Employee Acquiesce in the New Work Situation?

Plaintiff contends that the "new work situation" contemplated by this factor was the

particular task that she was performing for Plymouth at the time of her injury, i.e. operating the

rotary straightener machine. She argues that because her injury occurred the first time that she used the machine, she did not acquiesce to the "new work situation." In *Capps*, however, the Fifth Circuit focused upon the employee's decision to work for a company that loaned out temporary employees. *Capps*, 784 F.2d at 617. By agreeing to work for a company that loaned out temporary workers, the employee acquiesced to the fact that he would be sent to new work situations. *Id.*[18]

In the instant case, Carr applied with Spherion with the desire and expectation of being assigned to work at Plymouth. (Carr Depo., pgs. 24-25). She told Spherion that she was interested in working at Plymouth. *Id.* at pg. 129. Prior to her accident, her hope and goal was to be employed full-time by Plymouth. *Id.* at pg. 154. Carr clearly acquiesced to the work situation with Plymouth.

### 5. Did the Original Employer Terminate its Relationship with the Employee?

Plymouth does not contend that Spherion completely severed its relationship with Carr. Indeed, as discussed above, Spherion would be ill-advised to do so when it derived its income from lending out its employees to others. As the Fifth Circuit observed, if this factor required a complete separation between the lending employer and the employee, then the borrowed employee doctrine would be eliminated because there would never be two employers. *Capps*, 784 F.2d at 617-18. Instead, the court must focus upon the lending employer's relationship with the employee while the borrowing occurs. *Id.*

In this case, Carr testified that while at Plymouth her day-to-day contact with Spherion

---

[18] In fact, the plaintiff in *Capps* was injured on his first day of work with the borrowing employer while performing a new task. *Capps, supra.*

was no more than occasional.[19]  Moreover, although Carr emphasizes the work restrictions and

requirements imposed by Spherion at the time she was hired, there is no evidence that these

requirements were adhered to in practice or that Spherion imposed them upon Plymouth.

Accordingly, Spherion temporarily interrupted its relationship with Carr during her employment

with Plymouth.  *See, Capps, supra* (lending employer temporarily terminated its relationship

with employee where lending employer  exercised no control over employee and imposed no

restrictions *upon borrowing employer* with respect to employment).[20]

### 6.  Who Furnished Tools and Place for Performance?

Except for safety glasses, plaintiff agrees that Plymouth provided all tools and equipment.

(Carr Depo., pg. 102, Pl. Exh. 1).  Moreover, she did not exclusively rely upon the Spherion-

provided safety glasses to perform her work; rather, she admitted that she bought, and sometimes

used, her own spare pair of safety goggles.  *Id*.  This factor supports a determination that

Plymouth was plaintiff's borrowing employer.

### 7. Was the New Employment over a Considerable Length of Time?

For purposes of this factor, plaintiff again disingenuously focuses upon the length of time

that she spent working on the task that caused her injury instead of the length of time that she

---

[19]  During a shift, Carr had no contact with Spherion.  (Carr Depo., pg. 126; Pl. Exh. 1).
Once a temporary worker arrives at Plymouth, Spherion does not exercise any control over the
employee.  (Self Depo., pg. 28, Pl. Exh. 6).  During her tenure at Plymouth, the only time Carr
would contact Spherion would be if she had a pay problem or an issue regarding participation in
company activities at Plymouth.  (Carr Depo., pg. 127; Pl. Exh. 1).

[20]  In *Stephens v. Witco*, the Fifth Circuit declined to grant summary judgment under the
borrowed employee doctrine where there was a contract provision between the employers which
stated that the lending employer's workers would remain its employees.  *Stephens, supra*.
However*, Stephens* preceded the effective date of La. R.S. 23:1031(c) and did not contemplate
*Morgan v. ABC Manufacturer, supra*.

spent working for Plymouth overall.  Not surprisingly, plaintiff fails to support her interpretation of this factor with any supporting case law.  The evidence unequivocally establishes that Carr's first assignment from Spherion was to work at Plymouth where she worked exclusively for approximately eight months from September 2006 until the date of her accident.  (Carr Depo., pgs. 23, 35, Pl. Exh. 1).  Accordingly, Carr's employment with Plymouth persisted for a considerable length of time.  *Conner v. American Marine Corp.*, 684 So.2d 550, 553 (La. App. 4th Cir.1996) (four months was considerable length of time).

### 8.  Who Had the Right to Discharge the Employee?

Plaintiff contends that "[o]nly Spherion" enjoyed the right to discharge her employment. (Pl. Opp. Memo., pg. 11).  While Spherion unquestionably retained the right to discharge Carr, the courts agree that the focus of this inquiry is whether the borrowing employer had the right to end the employee's services with itself.  *Capps*, 784 F.2d at 618; *Sanchez, supra;  McGinnis, supra*.  Here, both Spherion and Plymouth agreed that Plymouth retained the right to remove a worker loaned by Spherion if Plymouth determined that her work was unsatisfactory.  (*See*, Self Depo., pgs. 32-33, Pl. Exh. 6; Griggs Depo., pg. 13, Pl. Exh. 7).  Accordingly, this factor supports a finding that Plymouth was Carr's borrowing employer.

### 9.  Who Had the Obligation to Pay the Employee?

It is not disputed that Spherion maintained Carr's employment records, issued her weekly wage payments, and withheld applicable taxes.  (*See*, Self Depo., pgs. 20-21, Pl. Exh. 6; Griggs Depo., pgs. 6-7, Pl. Exh. 7).  On the other hand, Plymouth determined Carr's rate of pay, forwarded her weekly work hours to Spherion, and then reimbursed Spherion for the wages it paid to Carr, plus an additional markup percentage.  (Self Depo., pgs. 11-13, 30-32, Pl. Exh. 6;

Griggs Depo., pgs. 10-11, Pl. Exh. 7; Carr Depo., pg. 34-35, Pl. Exh. 1). Contrary to plaintiff's

argument, these circumstances support a finding that Plymouth was Carr's special employer.

*Sanchez, supra*.[21]

In sum, the undersigned finds that the factors overwhelmingly favor a finding that

Plymouth was Carr's special or borrowing employer under the LWCA. Although plaintiff took

pains to adduce evidence that Spherion retained some level of control over Carr's employment,

this evidence does not detract from the determination that Plymouth was her special or borrowing

employer under the LWCA.[22] Plaintiff's evidence simply fails to establish genuine disputes over

determinative factual ingredients sufficient to make a difference in the result. *Capps, supra*.

## II.  Intentional Tort Exception to LWCA Immunity

Having found that Plymouth was plaintiff's special or borrowing employer, Plymouth is

not liable to plaintiff in tort unless her injury was caused by Plymouth's intentional act. La. R.S.

23:1032. Carr contends, of course, that Plymouth's conduct was such that the accident was

substantially certain to occur and that it rose to the level of an "intentional act." (Petition, ¶ V).

Louisiana courts have interpreted "intentional act" to mean the same as "intentional tort."

---

[21]  In her affidavit, plaintiff states that Spherion maintained her workers compensation
insurance and paid her compensation benefits after the accident. (Pl. Affidavit, Pl. Exh. 8). She
added that Plymouth did not pay her workers compensation benefits. *Id*. Payment of worker's
compensation benefits, however, is not one of the factors to be considered in the court's
borrowing employer analysis. *Pradia v. Southern Personnel of La., Inc.*, 776 So.2d 474, 480 n3
(La. App. 3d Cir. 2000). Moreover, the lending and borrowing employers are solidarily bound to
pay workers' compensation benefits under the LWCA. La. R.S. 23:1031(C). Thus, unless
Plymouth and Spherion have an agreement to the contrary, Spherion enjoys a right of
contribution against Plymouth for the latter's share of the worker's compensation payments. *Id*.

[22]  At best, the evidence merely demonstrates that Spherion remained her general
employer under the LWCA. *See*, La. R.S. 23:1031.

*White v. Monsanto Co.*, 585 So. 2d 1205 (La. 1991). An act is intentional when the employer either (1) consciously desires the physical result of his act; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result. *Id*. at 1208. In other words, "intent has reference to the consequences of an act rather than to the act itself." *White, supra*.

Louisiana courts have narrowly interpreted the intentional act exception to the immunity accorded by the LWCA. "The substantially certain test is satisfied when an employer *consciously* subjects an employee to a hazardous or defective work environment where injury to the employee is *nearly inevitable.*" *Guillory v. Domtar Industries, Inc.*, 95 F.3d 1320, 1327 (5th Cir. 1996) (emphasis in original). The term, "substantially certain," has been further defined to mean "virtually sure," and "incapable of failing." *Bridges v. Carl E. Woodward, Inc.*, 663 So.2d 458, 463 (La. App. 4th Cir. 1995); *Landry v. Uniroyal Chemical Co., Inc.*, 653 So.2d 1199, 1203 (La. App. 1 Cir. 1995); *Snow v. Lenox International*, 662 So.2d 818, 820, (La. App. 2d Cir. 1995); and *Scafidi v. Thompson-Hayward Chemical, Inc.*, 1995 Westlaw 341569 (E.D. La. June 6, 1995). It requires more than a reasonable probability, even more than a *high probability*, that an accident or injury will occur. *Bridges*, *supra*; *Landry*, *supra*. Mere knowledge and appreciation of risk does not constitute intent, nor does reckless or wanton conduct or gross negligence. *Id*.

In this case, Carr testified that before the date of her accident, she had never worked on the small or large rotary straightener machine. (Carr Depo., pgs. 72-73; Pl. Exh. 1). On the day of the accident, a Plymouth supervisor, Todd Pletka, told Carr that he wanted her to work on the rotary straightener machine. *Id*. at 39, 71. Pletka told her to retrieve some acetone and a pair of

18

gloves so she could clean the rotors. *Id*. Pletka ran three bars through the machine to show Carr how it was done. *Id*. at 71, 73. He told her to clean the bars before running them through the machine. *Id*. at 71. Pletka's demonstration and instructions took approximately fifteen minutes. *Id*. at 73. Carr then went to retrieve the materials necessary to complete the work. *Id*. at 71. When she returned, no one was there, so she removed the cover from the small rotary straightener, donned rubber gloves, and proceeded to clean the rotors. *Id*. at 74-75. After she cleaned the rotors, Carr replaced the rotor cover, dipped into the acetone, placed a tube on the table, and inserted the tube into the rotor. *Id*. At that point, her hand became trapped in the rotors. *Id*. at 75, 79. Eventually, Carr was able to free a hand and reach overhead to shut off the machine. *Id*. at 79.

Carr admitted that Pletka had showed her the "kill" switch on the machine. *Id*. at 83. Also, no other person besides Pletka was involved in Carr's assignment to the rotary straightener machine. *Id*. at 86. Pletka did not tell Carr not to use rubber gloves. *Id*. at 87. Carr had no information or knowledge that Pletka or anyone at Plymouth intentionally injured her. *Id*. at 118. Carr further testified that she had no knowledge or information that anyone knew or was substantially certain that she would be injured on the rotary straightener. *Id*. Plaintiff admitted that after her fifteen minute training session with Pletka, she felt comfortable enough to operate the machine. *Id*. at 143. However, she believed that the accident might have been prevented if she had been better trained or supervised, or if there had been a proper guard on the machine. *Id*. at 152-154.[23]

---

[23] At one point in her deposition, plaintiff seemed to suggest that, with proper training and experience, the machine was safe because her supervisor had operated the machine without incident. *Id*. at 142.

In response to defendant's motion, plaintiff adduced a report from Thomas Poole, P.E., a civil/structural engineer, who examined the subject rotary straightener machine, reviewed the circumstances of plaintiff's accident, and opined that the accident occurred because: of an unguarded opening on the feed side of the machine; both the tube and Carr's rubber gloves had been cleansed with acetone; and the high coefficient of friction between the rubber gloves and the steel tube. (Attach. to Thomas Poole Affidavit, Pl. Exh. 3). Poole further opined that the accident was aggravated by the inconvenient location of the emergency stop wire and Pletka's failure to supervise Carr while she operated the machine. *Id*.

Plaintiff also submitted a report from a certified safety professional, Herbert Bogert. (Attach. to Bogert Affidavit, Pl. Exh. 4). Bogert opined that the machine should have been equipped *inter alia* with a more readily accessed emergency cut-off. *Id*. He further stated that Plymouth's operation of the machine violated various provisions of OSHA and the National Safety Code. *Id*.

However, neither the failure to provide safety equipment, nor the failure to adhere to OSHA safety regulations constitute "intentional acts" sufficient to strip an employer's tort immunity. *Bridges*, 663 So.2d at 463. Even, an employer's knowledge that similar injuries had occurred in the past does not establish that a related injury was "substantially certain" to occur in the future. *See*, *Snow*, *supra*.[24] Here, Plymouth was not aware of any prior accidents involving

---

[24] In *Reeves v. Structural Preservation Systems*, the Louisiana Supreme Court wrote, "[b]elieving that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers' compensation." *Reeves v. Structural Preservation Systems*, 731 So.2d 208 (La. 1999). In *Casto v. Fred's Painting, Inc.*, the court effectively held that an employer's refrigerator which *always* shocked anyone who touched it did not give rise to an intentional tort. *Casto v. Fred's Painting, Inc.*, 692 So.2d 408 (La. 1997) *reversing*, *Casto v.*

the rotary straightener machine. (Plymouth 30(b)(6) Depo., pg. 4, Pl. Exh. 5).

Plaintiff posits that her accident would not have occurred if she had been properly trained or supervised, or if the machine had been equipped with a guard or a properly placed shutoff switch. However, these omissions do not suffice to maintain an intentional tort claim against Plymouth. *See e.g., Rogers v. Louisiana Dept. of Corrections*, 982 So.2d 252, 258-259 (La. App. 2d Cir.) (improper training and safety requirements do not establish intentional tort), *writ denied*, 992 So.2d 931 (La. 2008); *Armstead v. Schwegmann Giant Super Markets, Inc.*, 618 So.2d 1140, 1143 (La. App. 4th Cir. 1993) (defendant's failure to instruct plaintiff on how to operate meat grinder or to repair safety switch established no more than negligence or gross negligence).[25]

Accepting as true the facts adduced by plaintiff, and upon construing all of the evidence in a light most favorable to her, the court is compelled to find that plaintiff has failed to demonstrate that a jury could return a verdict in her favor on her intentional claim against Plymouth. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511; *see also, Hirst, supra* (awarding summary judgment in favor of defendant on plaintiff's intentional tort claim).[26] Accordingly,

*Fred's Painting, Inc.*, 688 So.2d 72 (La. App. 5th Cir.).

[25] Plaintiff asserted in her affidavit that the "improper kill switch and improper lock-out/tag-out procedures made this type of accident more probable than not substantially certain to occur." (Carr Aff.; Pl. Exh. 8). However, conclusory allegations that an accident was substantially certain to occur, do not suffice to defeat a motion for summary judgment. *Mitchell v. Exxon Corp.*, 860 F. Supp. 332, 336 (M.D. La. 1994) (citing *Simoneaux v. E.I. du Pont de Nemours and Co., Inc.*, 483 So.2d 908 (La. 1986)).

[26] Citing the Louisiana fourth circuit's decision in *Rayford v. Angelo Iafrate Contruction*, plaintiff contends that the intentional tort issue should be left to the trier of fact. *Rayford v. Angelo Iafrate Contruction*, 806 So.2d 898 (La. App. 4th Cir. 2002). Indeed, plaintiff's counsel cited *Rayford* for the same proposition in *Hirst v. Thieneman, supra*. However, the fourth circuit

Plymouth Tube Company is entitled to summary judgment. *Anderson, supra*.

## III. Claims Against Liability Insurance Carrier

Plaintiff's bare allegation against Travelers is that Travelers was Plymouth's liability insurance carrier. (Petition, ¶ III). Typically, a liability insurance carrier is subject to liability only when its insured is legally obligated to pay damages. *See, McGinnis, supra*.[27] Here, the dismissal of plaintiff's tort claim against Plymouth forecloses Travelers' liability as well.

## IV. Conclusion

For the above-assigned reasons, the undersigned finds that there is no genuine issue as to any material fact, and that defendants, Plymouth Tube Company and Travelers Property Casualty Company of America, are entitled to judgment as a matter of law dismissing plaintiff's claims in their entirety against said defendants. Fed.R.Civ.P. 56. Therefore,

**IT IS RECOMMENDED** that the motion for summary judgment [doc. # 91] filed by defendants, Plymouth Tube Company and Travelers Property Casualty Company of America, be **GRANTED**, and that plaintiff's claims against said defendants be **DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten**

---

found that *Rayford* was "totally inapplicable," in no small part because it was decided on an exception of no cause of action rather than on a motion for summary judgment. *Hirst*, 905 So.2d at 347. *Rayford* provides no more succor here.

[27] In response to defendants' motion for summary judgment, plaintiff has not advanced any alternative or independent basis for recovery against Travelers.

**(10) business days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 28th day January 2009.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE